IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,          Criminal Action
                                   No. 1:07CR412
          Plaintiff,

vs.                                Greensboro, North Carolina
                                   June 17, 2010
MARKO RUDI,

          Defendant.

_____/


          TRANSCRIPT OF SENTENCING PROCEEDINGS

       BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

             UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     ROBERT HAMILTON, ESQUIRE
                        Assistant United States Attorney
                        Post Office Box 1858
                        Greensboro, North Carolina 27402


For the Defendant:      MICHAEL A. GRACE, ESQUIRE
                        CHRISTOPHER CLIFTON,
                        Grace, Tisdale & Clifton
                        301 North Main Street
                        Suite 1200
                        Winston-Salem, North Carolina 27101


Court Reporter:         J. Calhoun, RPR
                        Room 101, U.S. Courthouse Building
                        324 West Market Street
                        Greensboro, North Carolina 27401
                        (336) 332-6033


          Proceedings reported by stenotype reporter.
       Transcript produced by computer-aided transcription.

1                            **INDEX**

2

                          DIRECT    CROSS    REDIRECT    RECROSS
3    WITNESSES FOR THE
     GOVERNMENT:
4
     Jonathan Fletcher        5
5
     Robert Hallyburton      15       23
6
     Russell Kennedy         25       28
7
     David Wedding           29       36
8
     GOVERNMENT'S
9    EXHIBITS:                                ADMITTED

10    1 - Real Estate Agreement               7
      2 - Real Estate Agreement               7
11    3 - Buyer Agreement                     9
      4 - Email                              10
12    5 - Offer to Purchase                  10
     6A, 6B, 6C - Charts and checks          15
13    7 - Letter                             17
      8 - Copy of certified check            20
14    9 - Check                              20
     10 - Letter                             21
15   11 - Letter                             23
     12 - Invoice                            27
16   13 - Letter                             33
     14 - Invoice                            40
17   15 - Documents                          41
     16 - Certificate of Authority           41
18   17A, 17B, 17C - Documents               42
     18 - Drivers Licence of Marko Rudi      42
19   19, 19A, 19B - Documents                44
     20, 20A - Documents                     44
20   21, 21A - Certification of Business Records 44

21

22

23

24

25

1          (Defendant is present.)

2          THE COURT:  Mr. Hamilton.

3          MR. HAMILTON:  The next case today is United States

4   versus Marko Rudi, 1:07:CR412.  He's here for purposes of

5   sentencing.  Mr. Rudi is present with his counsels, Mr. Clifton

6   and Mr. Grace.

7          THE COURT:  Mr. Clifton, would you talk to me about

8   objections.  If you would identify -- really what I am asking

9   you to do, not to argue them at this moment, because I

10  understand from the position papers there will be some

11  additional evidence presented today, but just for the record,

12  identify what those objections are.

13         MR. CLIFTON:  Yes, sir.  Our objection is to the

14  calculation of the gain amount.  Our other objection is to

15  levying restitution based on that gain.

16         THE COURT:  Now, do you have objections to any of the

17  factual content of the presentence report?

18         MR. CLIFTON:  No, sir.

19         THE COURT:  Mr. Rudi, do you agree with what

20  Mr. Clifton has just told me?

21         THE DEFENDANT:  Yes, sir.

22         MR. CLIFTON:  If I may for the Court, Mr. Rudi is very

23  sick.  He is feeling under the weather.  We've addressed trying

24  to get him some medication, but he looks a little doe-eyed.

25  He's had a cold for awhile.

 1          THE COURT:  Is that going to compromise your ability

 2    to go forward?

 3          MR. CLIFTON:  No, sir.  We've had very many lengthy

 4    discussions over the past week.  He's aware of what is going on.

 5    I wanted you to know if he stands up and he's a little raspy.

 6          THE COURT:  You are ready to go forward, Mr. Rudi?

 7          THE DEFENDANT:  Yes, sir.

 8          THE COURT:  If you should need a break during the

 9    course of this, let us know.

10          MR. CLIFTON:  Thank you.

11          Mr. Hamilton, does the Government have objections?

12          MR. HAMILTON:  Your Honor, we adopt the PSR.  We adopt

13    the alternative loss amount -- the gain amount that the PSR has.

14    The only position that I would like to perhaps change or bring

15    to the Court's attention is, I've done some additional research

16    as to whether or not the restitution is allowable in a situation

17    where gain is used to calculate loss.

18          In addition to the *Harvey* case cited by the Defense, I

19    also looked at the *Gallaway* case, 5095 3rd. 1246, and I've

20    consulted with my colleagues in the civil division, and we will

21    not ask the Court to award restitution.

22          We will ask to be heard when it comes to a fine, but

23    because there is no actual loss, we will not pursue a

24    restitution order in this case.

25          MR. GRACE:  We have no comment on that, Your Honor.

```
 1           THE COURT:  You don't object to that?
 2           MR. GRACE:  No, sir.  Absolutely not.
 3           THE COURT:  Do you have evidence, Mr. Hamilton?
 4           MR. HAMILTON:  Yes, Your Honor, we do.  We have four
 5   witnesses, if the Court will indulge us.
 6           THE COURT:  You may proceed.
 7           MR. HAMILTON:  First witness is a Mr. Fletcher.
 8        (JONATHAN FLETCHER, GOVERNMENT'S WITNESS, WAS SWORN.)
 9                    DIRECT EXAMINATION
10   BY MR. HAMILTON:
11   Q.   Would you state your name, sir.
12   A.   Jonathan Fletcher.
13   Q.   And how are you employed, sir?
14   A.   I work for Fonville Morisey, F-O-N-V-I-L-L-E M-O-R-I-S-E-Y
15   Real Estate.
16   Q.   And where are you located, sir?
17   A.   My office is in Durham.
18   Q.   Generally where do you operate out of?
19   A.   Durham, North Carolina.
20   Q.   Did there come a time in February of 2004, when you came
21   into contact with Marko Rudi and his wife, Debra?
22   A.   Yes.
23   Q.   Tell us how that happened.
24   A.   I was working phone duty at the office, and a call came in
25   from them.  There was a house they had identified that they
```

1  wanted to look at, so I made the arrangements for us to go -- or

2  to meet them and look at the house.

3  **Q.**   And after you showed them the house, or maybe before you

4  showed them the house, did you have them sign a document called,

5  Working With Real Estate Agents?

6  A.   Yes.

7        MR. HAMILTON:  I'm going to hand to the Defense a

8  packet of all the documents I'm going to hand to the witness, as

9  well as to the Court.

10        THE CLERK:  Government's Exhibit Number 1 marked for

11  identification.

12  BY MR. HAMILTON:

13  **Q.**   Government's Exhibit Number 1, are you familiar with that

14  document, sir?

15  A.   Yes, I am.

16  **Q.**   And what is it?

17  A.   According to North Carolina Real Estate Commission, at the

18  first substantial contact, we are supposed to discuss with our

19  buyer and/or seller, the relationship that they will have with

20  the agent.  That's as far as who represents them in different

21  situations, and this is an acknowledgment that I have gone over

22  that brochure with them.

23  **Q.**   And who signed it?

24  A.   This one is signed by Mr. and Mrs. Rudi.

25  **Q.**   And who --

1   A.   My name is on there.

2   **Q.**   Who did you think was the client at that time?

3   A.   I thought it was Mr. and Mrs. Rudi.

4   **Q.**   Did you later have a conversation with Mr. Rudi which

5   caused you to execute another real estate agreement?

6   A.   Yes, I did.

7   **Q.**   Government's Exhibit Number 2, do you recognize that

8   document?

9   A.   That's the same document with South Bay Partners' name on

10   it.  When it was indicated that South Bay Partners would be

11   purchasing the house, I needed to somehow have verification that

12   I have gone over that brochure with South Bay Partners.

13   **Q.**   And on Government's Exhibit Number 2, who signed as the

14   buyer or seller?

15   A.   Well, Mr. Rudi's name is on there.

16   **Q.**   And did he fill that out in your presence?

17   A.   Yes.

18          MR. HAMILTON:  I move into evidence Government's

19   Exhibits 1 and 2.

20          THE COURT:  Is there an objection?

21          MR. GRACE:  There is none, Your Honor.

22          THE COURT:  One and two are admitted.

23   BY MR. HAMILTON:

24   **Q.**   Mr. Fletcher, when was the first time you heard mention of

25   the company South Bay?

A.   I don't know the specific time.  I'm assuming by the date

on here that it was February 23rd of 2004.

Q.   Is it your normal practice and your practice in this case,

to have the client sign a document called, Exclusive Right To

Represent Buyer?

A.   Yes, sir.  It is our company policy that that document be

signed prior to an offer being written up.

Q.   And I approach you with what's been marked as Government's

Exhibit Number 3, sir.  Do you recognize that document?

A.   Yes, sir.

Q.   What is it?

A.   This is the buyer agency agreement for Exclusive Right To

Represent Buyer.

Q.   And who is listed as the buyer?

A.   South Bay Partners, LLC.

Q.   Who initialed each page?

A.   Looks like Mr. Rudi.

Q.   And on the last page where it says buyer, whose name is

listed?

A.   Mr. Rudi's name.

Q.   Were you present when this document was executed?

A.   Yes, sir.

Q.   Was there anybody else from South Bay Partners there?

A.   No, sir.

          MR. HAMILTON:  Your Honor, offer into evidence Number

1    3.
2              THE COURT:  Is there an objection?
3              MR. CLIFTON:  No, sir, Your Honor.
4              THE COURT:  Three is admitted.
5    BY MR. HAMILTON:
6    Q.    What house were you in the process of representing them to
7    purchase?
8    A.    The address was 7 Birnham Lane.
9    Q.    And were there negotiations with the realtor for the seller
10   as to the price?
11   A.    Yes, there were.
12   Q.    And would you at the time make offers or counteroffers
13   while buying this house?
14   A.    Yes, sir.
15   Q.    Who gave you your instructions or direction on how to do
16   that?
17   A.    They came from Mr. Rudi.
18   Q.    I want to approach with what's been marked as Government's
19   Exhibit Number 4, which appears to be an email.  Can you
20   identify Number 4?
21   A.    Yes.  It is an email that I had sent to Mr. Rudi
22   questioning about the offer that was being made on the house.
23   That was -- I'm assuming it was a counteroffer.
24   Q.    Could you go to the middle of that page.  Actually, let me
25   offer it into evidence before I have it read, Your Honor.

```
 1              THE COURT:  Do you have a copy?

 2              MR. HAMILTON:  It should be in the documents.

 3              THE COURT:  Okay.  You have all of those in that one

 4    package?

 5              MR. HAMILTON:  Yes, sir, they are.

 6              THE COURT:  It is just the next item?

 7              MR. HAMILTON:  Yes, sir.  It should be an email

 8    addressed to John Fletcher on the top.

 9              THE COURT:  Okay.

10    BY MR. HAMILTON:

11    Q.   Is that Government's Exhibit Number 5, sir?

12    A.   This one is Number 4.

13              MR. HAMILTON:  I would offer Number 4 into evidence,

14    Your Honor.

15              THE COURT:  Is there an objection to four?

16              MR. GRACE:  There is none, Your Honor.

17              THE COURT:  Give me a moment to read this, if you

18    would.

19    BY MR. HAMILTON:

20    Q.   Sir, if you could focus your attention on the middle of the

21    page where it says, "Dear John," and there is a paragraph

22    repeating the name John.  It says, "Hope you're doing well."  Do

23    you see that?

24    A.   Yes, sir.

25    Q.   Is that a response by Mr. Rudi to a question that you had
```

1  asked?

2  A.   Yes, it is.

3  **Q.**   Can you read Mr. Rudi's response?

4  A.   "John, I hope you're doing well.  I have been following the

5  email trails on all of the discussions, and here is what I have

6  decided.  I am not interested in going back and forth on this

7  issue.  The offer we gave them is very good.  We have no rush to

8  buy this house, neither are we interested in the most expensive

9  house in the neighborhood, which about 67 other houses up for

10  sale.  This house has serious structural problems and I'm not

11  willing to cut any corners.  I want them to drop price by

12  $10,000, or the deal is off.  I am not willing to invest any

13  more time or money into this deal unless we get some major

14  concessions from their side.  Thanks, Marko."

15  **Q.**   Mr. Fletcher, did you execute or carry out your client's

16  advice?  Were there other negotiations that continued until the

17  house was actually purchased?

18  A.   Yes.  While this was them wanting to drop the price by

19  $10,000 as indicated after the contract had been signed at 560,

20  and that's why we had that $550,000 amount.

21  **Q.**   Eventually, sir, did you, on behalf of your clients, make

22  an offer to purchase Birnham?

23  A.   Yes.  That would have been prior, I believe, to this email.

24  **Q.**   All right, sir.  And this is Government's Exhibit Number 5

25  for identification.  Can you identify that offer to purchase?

1 A. It is the offer to purchase 7 Birnham Lane, for $560,000.

2 **Q.** Who was listed as the buyer?

3 A. The buyer is listed as South Bay Partners, LLC.

4 **Q.** Who signed for South Bay Partners on the last page?

5 A. I'm going to assume that that's Vitaly Burdanov's

6 signature.

7 **Q.** Is there something typed underneath the signature?

8 A. Yes. That's why I'm assuming --

9 **Q.** Did you ever meet a Vitaly Burdanov?

10 A. No.

11 **Q.** Did you ever talk with him?

12 A. No, sir.

13 **Q.** How did you get that contract signed by Mr. Burdanov?

14 A. It was sent overnight Federal Express UPS to South Bay

15 Partners.

16 **Q.** And was this house eventually purchased, Birnham Lane, for

17 approximately $560,000?

18 A. Yes, sir.

19 **Q.** Do you have any knowledge as to where these funds that came

20 to purchase the $560,000, where they originated from?

21 A. I know they were from an overseas account, because I

22 remember there was some issues with the money not being there in

23 time or we were concerned because it was getting very close.

24    MR. HAMILTON: I tender the witness.

25    MR. GRACE: I have no questions. I want a

1  clarification.  If I understand correctly, the relevance of this

2  witness is to --

3          THE COURT:  Should we ask him to leave the courtroom

4  while we do that?

5          MR. GRACE:  But I have absolutely no questions of him,

6  Your Honor, but I'm not sure of the relevance and I would like

7  to address that point.

8          THE COURT:  You may come down.

9          MR. HAMILTON:  Your Honor, may he not be excused -- he

10  needs to come down, but stay in the area, Your Honor?

11          THE COURT:  Just outside in the hall.

12          MR. HAMILTON:  Yes, sir.  Thank you.

13          MR. GRACE:  I did not make an objection at the time

14  this witness testified, nor did I object to the introduction of

15  those exhibits.  I do have an overall question about relevance.

16  If this witness and subsequent witnesses are put up to establish

17  that Mr. Rudi had some connection with that house, we're not

18  going to contest that, we never have.  Haven't in the

19  presentence report and we won't at this point.

20          I think the issue we're here on today is whether there

21  is the benefit of 255,000, which we have conceded in the PSR,

22  and that 800,000 that the Government contends and anything that

23  didn't address itself to why the difference between -- given

24  800,000 should be considered benefit, I think is irrelevant, and

25  any witness that didn't have anything to add to that question of

1   benefit to Mr. Marko, I would contend to you, would be an

2   irrelevant witness and this witness added nothing to that.

3          THE COURT:  I will hear their testimony and then you

4   can -- I certainly understand your position.  You can argue at

5   the conclusion about the nonrelevance, but I will hear their

6   testimony.

7          MR. GRACE:  I understand.  That would be my position.

8   I don't see anything to question this witness about.

9          THE COURT:  Mr. Hamilton.

10         MR. HAMILTON:  No further questions of this witness.

11  May he be excused so he can return to work?

12         MR. GRACE:  Without objection, Your Honor.

13         THE COURT:  He may.

14         MR. HAMILTON:  Your Honor, next I would like to

15  offer -- I'm not sure of my exhibit number.  Six.  Your Honor,

16  this is just -- as the Court may have noted in the Government's

17  position paper, we had a chart that listed all the funds that

18  went into the house and the remodeling of the house.  To save

19  time, rather than to bring each individual witness up who was

20  involved in that, I thought I would just -- because I don't

21  believe there is an objection -- offer the checks and the wires

22  to support my chart to show exactly how we arrived at that

23  figure.

24         THE COURT:  Okay.

25         MR. HAMILTON:  I'll mark that in evidence.

1          MR. GRACE:  Could we have one moment, Your Honor?

2          THE COURT:  You may.  We'll take a five minute break

3    and let you all talk about this.

4          (Recess taken.)

5          MR. HAMILTON:  We've spoken, Your Honor, and in an

6    effort to try and streamline things, we're just going to offer

7    that chart that appears in the Government's position paper.  I

8    understand the Defense will stipulate to the fact that the

9    documents in support exist.  The only thing we're attaching to

10   it, there are two personal checks that I may discuss in

11   argument.  So this would be Government's Exhibit Number 6, Your

12   Honor.

13         THE COURT:  I may suggest we have these individual

14   documents marked individually, that we have six as the

15   collective exhibit, 6A is the chart, 6B, 6C.

16         MR. HAMILTON:  Thank you, Your Honor.

17         Your Honor, the next witness will be Robert

18   Hallyburton.  Mr. Hallyburton.

19         **(ROBERT HALLYBURTON, GOVERNMENT'S, WITNESS, WAS**

20   **SWORN.**)

21                         **DIRECT EXAMINATION**

22   BY MR. HAMILTON:

23   **Q.**   Sir, would you state your name for the record.

24   A.    Robert S. Hallyburton.

25   **Q.**   What do you do for a living, sir?

1    A.    General contractor.

2    **Q.**    Did you ever perform any work at Birnham Lane in Durham?

3    A.    Yes, I did.

4    **Q.**    Could you tell us how you got that job?

5    A.    I received a phone call from the customers at my office.

6    They left a message saying -- and then when I met with them,

7    they said they had seen my signs up in the neighborhood, Hope

8    Valley.

9    **Q.**    Who did you meet with?

10    A.    I can't recall if I met with one -- with either Debra or

11    Marko Rudi first, but I know I met both of them at the house at

12    Birnham Lane several times.

13            THE COURT:  Who did you receive the telephone call

14    from?

15            THE WITNESS:  It was either Debra or Marko.  I'm

16    almost positive it was Debra Rudi, but I'm not a hundred percent

17    positive on the first phone call.

18            THE COURT:  Do you have some level of satisfaction

19    that it was either Mr. Rudi or Ms. Rudi?

20            THE WITNESS:  Oh, yes.  Absolutely.

21    BY MR. HAMILTON:

22    **Q.**    Did they in fact hire you or engage you to perform some

23    remodeling work at Birnham?

24    A.    Yes, they did.

25    **Q.**    Did they indicate to you for whom you would be doing the

1  work?

2  A.    Yes.  For them, it was clear.  We provided an estimate and

3  they provided specifications on what they wanted and we walked

4  through the house several times with them, with both of them.

5  Q.    Who did you invoice for the work?

6  A.    I didn't look back at my invoice this morning, but I'm

7  pretty sure it was either Marko Rudi or Debra and Marko Rudi.

8  Q.    Did Mr. Rudi ever mention a company called South Bay?

9  A.    No.

10  Q.    Did there come a time when you were advised that your

11  services would no longer be needed?

12  A.    Yes.  At one point one morning, we walked into the job, and

13  there was a document laying on the countertop that said, to my

14  recollection, that, you know, we would like you to terminate all

15  work, but it even said at the bottom specifically, do not remove

16  any dirt from the rear yard.

17  Q.    I approach with what's been marked as Government's Exhibit

18  Number 7.  Can you identify that document, sir?

19  A.    Yes, I do.  This was laying on the counter that morning and

20  even though it says via facsimile to my office number, it was

21  not faxed to my office, it was laying on the counter at the

22  house at 7 Birnham Lane.

23        MR. HAMILTON:  Offer into evidence Government's

24  Exhibit Number 7.

25        THE COURT:  Is there an objection?

1      MR. GRACE:  There is not, Your Honor.

2  BY MR. HAMILTON:

3  Q.   Sir, who signed that?

4  A.   It says Debra and Marko Rudi, but I can't read the

5  signature.

6  Q.   Is there an address listed at the top left?

7  A.   I mean, on their letterhead, Mr. and Mrs. Marko Rudi, 7

8  Birnham Lane.

9  Q.   Is that the address where you were working, 7 Birnham Lane?

10 A.   That's correct, yes.

11 Q.   Had you been given advance funds to work on that project?

12 A.   Yes.  We had asked for a deposit upon signing the contract,

13 and we -- they gave us -- it was either -- there were two

14 payments.  It was either 20,000 or 25,000.  I'm not sure which

15 one was the first but, yes, that was advanced money, one of

16 those payments.

17 Q.   How were you paid that money?

18 A.   Excuse me?

19 Q.   How did you receive that money?

20 A.   Marko asked for wiring instructions to my bank account, and

21 I provided that to him, and the money arrived via wire into my

22 bank account.

23 Q.   Did there come a time that you discussed with Mr. Rudi that

24 he might be owed a refund or rebate for overpayment?

25 A.   Yes.  After the termination letter and then subsequent to

```
 1   that, I think it was either that day or the next day, Marko and
 2   I actually talked on cell phones, and Marko said that Debra had
 3   determined that she could not work with me any more, and that if
 4   it was up to him, he would still, you know, be working with me,
 5   and that if there was any money -- he knew he had paid in
 6   advance, basically, so if there were any money that I owed him
 7   or if he owed me any money, he said to figure up what the
 8   settlement would be.  So I figured up what the settlement was,
 9   and I did owe him back approximately $12,000 and some change.
10   Q.   I'm going to approach you with what's been marked as
11   Government's Exhibit Number 8.  Can you identify that document?
12   A.   Yes.  This is a copy of the certified bank check that I
13   gave to him for the refund, to Marko Rudi.
14   Q.   All right, sir.  And who did you make the check payable to?
15   A.   Marko Rudi.
16   Q.   Did you later have any other contact with Mr. Rudi about
17   that check?
18   A.   Yes.  I can't recall how long it was, but at some point
19   after that, he called me up on the cell phone and told me that
20   his -- he had given the check that I had given him for the
21   refund, it had been lost, that he had given it to his accountant
22   to deposit and something about -- I don't know if it was
23   something about the endorsement wasn't correct, and that the
24   bank had lost the check, so he asked me if I would, you know,
25   give him another check.
```

1   **Q.**  Did you do that?

2   A.  I told him that I would, you know, I would bring the matter

3   up with my bank.  So I went to my bank and talked to my bank

4   officer about it and they said they would do research on the

5   check to find out if it had been processed and get back to me.

6   They got back to me in a couple of days, and said that it had

7   not been processed, but I really should wait about 90 days

8   before I reissued another check.  So I called up Marko and told

9   him that my bank had said that I needed to wait 90 days before I

10  reissued a check, and he was fine with that.  So I told him I

11  would call him back.

12  **Q.**  All right, sir.  I'm going to show you what's been marked

13  as Government's Exhibit Number 9.  Would you tell us what that

14  is.

15  A.  Yes.  This is the second check for the refund that is dated

16  May 17th, 2005.

17         MR. HAMILTON:  Your Honor, I offer into evidence both

18  of those check exhibits.

19         THE COURT:  Objection?

20         MR. GRACE:  No, sir, Your Honor.

21         THE COURT:  Nine is admitted.

22  BY MR. HAMILTON:

23  **Q.**  Hallyburton, did there come a time in approximately

24  December of 2005, that you received a letter -- I want to show

25  you Government's Exhibit Number 10, and see if you can recall.

1    A.    Yes.   We received this letter and, you know, it seemed kind

2    of strange to us that we were receiving this letter.   We also

3    had a couple of phone calls on our office answering machine

4    about this same issue.

5    Q.   First tell me if you can identify the letter.

6    A.    Yes, I can identify the letter.   We received this letter.

7              MR. HAMILTON:   Offer into evidence Government's

8    Exhibit Number 10.

9              THE COURT:   And it is admitted.

10   BY MR. HAMILTON:

11   Q.   Could you please tell the Court who the letter is from.

12   A.    It is from South Bay Partners, signed by Jan Jogis Laats,

13   general manager, South Bay Partners.

14   Q.   Could you read the letter.

15   A.    To Robert S. Hallyburton Building, Incorporated.

16        "Dear Sir or madam, during the audit of our accounting

17   records by our external auditors, it has come to our attention

18   that all invoices by you have been incorrectly addressed to our

19   project manager and not to our company.   Please reissue all

20   invoices with the following correct addressee, South Bay

21   Partners, LLC, 7 Birnham Lane, Durham, NC 27705.   Please fax the

22   corrected sales orders to my attention at (786)513-0358 at your

23   earliest convenience.   We would appreciate it if you are able to

24   fax the reissued sales order by December 13th.   Best regards,

25   Jan Jogis Laats."

1  Q.   Sir, at the bottom of that page is there an address?

2  A.   There is.

3  Q.   Could you read it?

4  A.   510 Meadowmont Village Circle, Suite 274, Chapel Hill,

5  North Carolina 27517.

6  Q.   Is there a phone number there, sir?

7  A.   Yes.  The phone says (202)470-0155, and then there is a fax

8  number.

9  Q.   Sir, do you do business in Chapel Hill here?

10 A.   I do.

11 Q.   Are you familiar with area code 202 in the Chapel Hill

12 area?

13 A.   No.

14 Q.   Did you do anything in response to that letter?

15 A.   We did not do anything in response to the letter.  My

16 office manager asked me what I wanted to do about it and I told

17 him not to do anything about it.

18 Q.   Did you in time receive another letter from South Bay

19 Partners?

20 A.   I did.  I received another letter.

21 Q.   I'm going to approach you with what's been marked as

22 Government's Exhibit Number 11?

23 A.   Yes.  I did receive this letter.

24       MR. HAMILTON:  I would offer it into evidence, Your

25 Honor.

1      MR. GRACE:  No objection, Your Honor.

2      THE COURT:  Eleven is admitted.

3  BY MR. HAMILTON:

4  Q.   Sir, would you read the letter to the Court.

5  A.   Yes.  To Robert S. Hallyburton Building, Inc.  "We

6  contacted you via email on December 2nd, 2005 and asked you to

7  reissue an invoice previously incorrectly addressed to our

8  project manager and not to our company.  Since we have not

9  received any reply, we resubmit our request, as such

10 documentation is required by our external auditors.  Please

11 reissue the identified invoice and contract with the following

12 addressee, South Bay Partners, LLC, 7 Birnham lane, Durham, NC,

13 27705.  Please fax the corrected sales orders to my attention at

14 786-513-0358 at your earliest convenience, or mail the reissued

15 invoice to our business address at 510 Meadowmont Village

16 Circle, Suite 274, Chapel Hill, NC 27517.  Best regards, Jan

17 Jogis Laats."

18 Q.   Sir, before receiving those letters, had you ever heard of

19 South Bay Partners?

20 A.   No, sir.

21     MR. HAMILTON:  Your Honor, I tender the witness.

22     THE COURT:  Mr. Clifton?

23                 **CROSS-EXAMINATION**

24 BY MR. CLIFTON:

25 Q.   When did you begin working on the house?

1    A.    I want to say it was June, around June of 2004, to my

2    recollection.   I've got papers if I need to look at it.

3    Q.    General time frame is fine.   Thank you.

4          Have you ever worked on a residence before that was owned

5    by a corporation or a LLC instead of an individual?

6    A.    No.

7    Q.    No?

8    A.    No.

9    Q.    How did you know that -- you said you met with Marko and

10   Debra.   How did you know that they were even the owners of the

11   house?

12   A.    I didn't.

13   Q.    Have you ever done any commercial work on property owned by

14   a LLC or corporation?

15   A.    No.

16   Q.    So you've always dealt with individuals?

17   A.    Correct.

18   Q.    Did you go back and check the sales contract or the deed or

19   anything else to see who actually owned the residence?

20   A.    No, I didn't.

21             MR. CLIFTON:   If I may approach the witness, Your

22   Honor.

23             THE COURT:   You don't need to get my permission to do

24   that.

25

BY MR. CLIFTON:

**Q.** I'm going to show you what was the offer to purchase and contract. Have you ever seen one of these in regards to a real estate sale before?

A. Sure.

**Q.** Who is listed as the buyer?

A. South Bay Partners.

**Q.** And that's who the letters that were sent to you came from regarding the change in invoices to that corporation?

A. That's correct.

MR. CLIFTON: Thank you. I have no further questions, Your Honor.

MR. HAMILTON: Nothing further, Your Honor. May he be excused to return to his duties, Your Honor?

MR. GRACE: No objection.

THE COURT: Yes, he may. Thank you, sir.

MR. HAMILTON: Your Honor, we're calling Mr. Kennedy to the stand.

**(RUSSELL KENNEDY, GOVERNMENT WITNESS, WAS SWORN.)**

**DIRECT EXAMINATION**

BY MR. HAMILTON:

**Q.** Would you please state your name for the record.

A. Russell Kennedy.

**Q.** How are you employed, sir?

A. Kennedy Building Company, Incorporated. Self-employed.

1    Q.   Mr. Kennedy, did you ever have a time to be hired by or

2    meet Marko Rudi?

3    A.   Yes, sir.

4    Q.   Tell us how you first met Mr. Rudi.

5    A.   He contacted us in reference to renovation on a home.

6    Q.   Did you first meet him on the phone or in person?

7    A.   I think it was a phone conversation followed by a personal

8    meeting.

9    Q.   What did he tell you, if anything, he wanted you to do?

10   A.   It was general renovation of a house, and I think

11   eventually there was a patio involved.

12   Q.   All right, sir.  Did he indicate how he would pay you for

13   the services?

14   A.   We discussed the frequency of the payments as far as every

15   30 days or whatever.  I don't know if we got into the specific

16   method of payment, you know, maybe until after the contract was

17   signed.

18   Q.   Did you receive wire payments at some point?

19   A.   Yes.  I did receive wire payments.

20   Q.   Do you know where those payments originated from?

21   A.   Best of my recollection, they were overseas, but I'm not

22   exactly sure where from overseas.

23   Q.   All right, sir.

24        Did you deal with anybody besides Marko and Debra Rudi,

25   regarding instructions as to what you were to be doing?

1  A.   No, sir.  It was strictly Debra and Marko.

2  **Q.**   Did Mr. Rudi ever mention the word South Bay to you?

3  A.   I don't recall him mentioning the word South Bay to me in a

4  conversation, no, sir.

5  **Q.**   Did you at the time send invoices to the Rudies?

6       THE CLERK:  Government's Number 12 marked for

7  identification.

8  BY MR. HAMILTON:

9  **Q.**   I'm going to show you Number 12, Mr. Kennedy, and ask you

10  if you recognize that as one of your invoices.

11  A.   Yes, sir.  That is one of my invoices.

12       MR. GRACE:  No objection.

13       THE COURT:  12 is admitted.

14  BY MR. HAMILTON:

15  **Q.**   Who is that invoice made out to?

16  A.   Mr. and Mrs. Marko Rudi.

17  **Q.**   And the caption says what project?

18  A.   There is a caption that says, project for job named Rudi

19  for address 7 Birnham Lane, Durham, North Carolina.

20  **Q.**   At any time when you were working on 7 Birnham Lane, was

21  anybody living there?

22  A.   At the end, yes, sir, when we were finishing up.

23  **Q.**   And at the time you finished up, who was living there?

24  A.   Mr. and Mrs. Rudi was living there.

25  **Q.**   After you completed working on the house, were you ever

```
 1   contacted by anyone to discuss invoices?
 2   A.   After completing some time -- after completing, I received
 3   a letter in the mail about redirecting or renaming invoices to
 4   South Bay.
 5   Q.   And did you do that?
 6   A.   No, sir.
 7   Q.   Were you familiar with South Bay?
 8   A.   No.  Never heard of it before.
 9           MR. HAMILTON:  Your Honor, I tender the witness.
10           MR. GRACE:  One moment please, Your Honor.
11           THE COURT:  Sure.
12                        CROSS-EXAMINATION
13   BY MR. GRACE:
14   Q.   Sir, are you an incorporated business?
15   A.   Yes, sir, an S corp.
16   Q.   Do you have an accountant, someone who does your books?
17   A.   Yes.
18   Q.   What would happen if you supplied an invoice to your
19   accountant to another company that you claim as your's?
20   A.   I'm sorry, I don't understand the question.
21   Q.   If you submitted an invoice to your accountant for some
22   payment that you had made and it was addressed to another
23   company, what would your accountant do?
24   A.   I don't know what I would do.
25   Q.   He would make you get it in your name, wouldn't he?
```

1  A.   I would assume so, but I don't know that.  I'm not an

2  accountant.

3  Q.   Do you submit any invoices to your accountant for payments?

4  A.   No, sir.  I do all my receivables myself in-house.

5  Q.   They are all in your name, aren't they?

6  A.   They are all in my company name, yes, sir.

7           MR. GRACE:  Thank you.

8           THE COURT:  Anything further?

9           MR. HAMILTON:  Nothing further, Your Honor.  May the

10  witness be excused?

11           THE COURT:  Thank you, Mr. Kennedy.  Yes, sir.

12           MR. GRACE:  Yes, sir.

13           MR. HAMILTON:  Your Honor, we would call Mr. David

14  Wedding to the stand.

15           **(DAVID LEWIS WEDDING, GOVERNMENT WITNESS, WAS SWORN.)**

16                     **DIRECT EXAMINATION**

17  BY MR. HAMILTON:

18  Q.   Sir, would you please state your name.

19  A.   David Lewis Wedding.

20  Q.   And how are you employed, sir?

21  A.   I'm a partner with international accounting firm Grant

22  Thornton, LLP.

23  Q.   What is your training and profession?

24  A.   My training profession by background, I've worked in the

25  accounting audit practice for almost 30 years, a certified

1    public accountant, certified fraud examiner, and I'm the

2    practice leader at Grant Thornton for our southeast region

3    forensic investigative service group.

4    **Q.**   Sir, did there come a time in approximately August 2005,

5    where one of your clients, RTI, asked you to assist them?

6    A.   Yes, there was.

7    **Q.**   And in that capacity, did you sit in on an interview of

8    Mr. Marko Rudi?

9    A.   Yes, I did.

10   **Q.**   And during that interview, were you asking questions or

11   were other people asking questions?

12   A.   Other people were asking most of the questions.  I asked

13   some.  I had a lot of documents and also took a lot of notes.

14   **Q.**   Did you ask Mr. Rudi if he knew someone named John or Jan?

15   A.   Someone on the interview team did ask him that.

16   **Q.**   And did you give him the last name or how was it presented

17   to Mr. Rudi, the question?

18   A.   We asked him if he could just describe his relationship.

19          MR. GRACE:  I'm going to object at this point.  May I

20   be heard here or at the bench?

21          THE COURT:  I'm going to hear the testimony and then

22   hear your objection.

23          MR. GRACE:  Good enough.  Thank you, Your Honor.

24          THE COURT:  Proceed.

25          THE WITNESS:  He was asked to describe his

1  relationship with Jan Jorgis Laats, I believe was his full name.

2  BY MR. HAMILTON:

3  **Q.**   What was his response, Mr. Rudi's response?

4  A.   He indicated that he did have a relationship with Jan.  He

5  knew him from Estonia, back before he started to work for RTI.

6  He described the relationship more as an acquaintance than an

7  actual friend.  He said they knew some of the same people, kind

8  of a friend of a friend type relationship.  He then indicated

9  that, you know, Jan had gone to work for BSH and was one of the

10  employees at BSH that worked on the outsourcing contract.  He

11  also indicated that, you know, he did not have, you know, an

12  outside business relationship with Jan, which was later

13  contradicted in other statements that he made.

14  **Q.**   Later on in the interview, did Mr. Rudi retract that or

15  make a different statement as to his business relationship with

16  Mr. Laats?

17  A.   He did.  He indicated after we had presented him with

18  certain documents, that he had conducted business with

19  Mr. Laats, including borrowing money from one of Mr. Laats'

20  companies to purchase a Mercedes for his wife Debra.  He also

21  indicated Mr. Laats had some business relationship with

22  Mr. Marko's father as well.

23  **Q.**   Did Mr. Rudi indicate what company affiliated with

24  Mr. Laats may have loaned him money for that car?

25  A.   For the car that was Exford

1  **Q.**  Did you ask Mr. Rudi then at that time, or did the people

2  with you ask Mr. Rudi his knowledge of Exford Corporation?

3  A.    Yes.  We asked him his knowledge of Exford.  His initial

4  response was, he was not familiar with Exford, never done any

5  business with Exford and, again, that was later retracted after

6  we presented him with some additional documents.

7  **Q.**  Do you remember what kind of documents you presented him

8  regarding Exford?

9  A.    One of the documents was a lease agreement, it was

10  unsigned, but it was a lease agreement between Mr. Rudi and

11  Exford for Exford to loan him funds, up to around $50,000, to

12  purchase this Mercedes that I described earlier.

13  **Q.**  Did you also show him a letter that had purportedly been

14  written by a designer by the name of Heather Garrett?

15  A.    Yes, I did.  And that letter dealt with some remodeling

16  that was done at 7 Birnham Lane, the house that Mr. Rudi

17  occupied.

18  **Q.**  I want to approach you with what we will mark as

19  Government's Exhibit 13.  And ask if you recognize that

20  document.

21  A.    Yes.  I recognize this document.

22        MR. HAMILTON:  Your Honor, I would move it into

23  evidence at this time.

24        MR. GRACE:  If we can look at it a moment, Your Honor.

25  No, sir.

1    THE COURT:  You are not objecting?

2    MR. GRACE:  No, sir.

3    THE COURT:  Thirteen is admitted.

4  BY MR. HAMILTON:

5  Q.   Mr. Wedding, would you please read the letter to the Court.

6  A.   "Dear Heather, I hope you're doing well.  I have been

7  trying to reach you, but it seems you have moved and the phone

8  number I have for you no longer works.  I am trying to finalize

9  my last year's accounting records and I realize that I misplaced

10 copies of your invoices.  Exford Management made two wire

11 transfers to you, one for invoice number 1001 for the amount of

12 $5,228.04, and the other one for invoices number 1002 and 1003

13 for the amount of 33,100.  Please make sure that you list

14 furnishings, et cetera, separately from the professional

15 services.  Please feel free to call me if you should have any

16 questions.  Thank you, Marko Rudi, 7 Birnham Lane, Durham," and

17 it includes his phone number and email contact.

18 Q.   All right, sir.  So after you showed Mr. Rudi this letter,

19 did you have a different discussion as to his knowledge of

20 Exford?

21 A.   Yes.  He said he was familiar with Exford, it was one of

22 Mr. Laats' companies, and that he was helping Mr. Laats

23 redecorate the 7 Birnham Lane house.

24 Q.   Did that differ from his initial response when you asked

25 him about Exford?

1  A.    Yes.  His initial response was, he was not sure what it

2  was, not done any business with it.

3  Q.    Were you present at the same meeting when he was asked any

4  questions about South Bay Partners?

5  A.    Yes, I was.

6  Q.    And do you recall what his response was?

7  A.    Very similarly response.  He initially indicated that he

8  was not familiar with South Bay, had not done any business with

9  South Bay and very similar to Exford, as we presented certain

10  documents to him, he acknowledged that he had engaged in some

11  business with South Bay, was familiar with them.  Again, that

12  they were a company that Mr. Laats was involved with.

13      He indicated that he had entered into a lease agreement

14  with South Bay to lease the 7 Birnham Lane property from them,

15  and that it was a company controlled by Mr. Laats.  He also

16  indicated that BSH was involved with South Bay and had made some

17  real estate investments with South Bay.

18  Q.    Did he initially indicate to you that BSH and South Bay

19  were related or --

20  A.    He initially indicated they were not related.

21  Q.    Did that?

22  A.    That changed over the course of testimony, again, as we

23  presented him with certain documents.

24  Q.    And what was his final statement as to the relationship of

25  BSH and South Bay?

```
 1   A.    That BSH was an investor in South Bay.
 2   Q.    Finally, sir, did you ask him if he had ever heard of
 3   Kennedy Building Company?
 4   A.    Yes, we did.  He indicated that he had not heard of Kennedy
 5   Building Company.  We then presented him with some invoices from
 6   Kennedy Building to him, and at that point, he indicated that,
 7   you know, he was helping Mr. Laats redesign, do some decorating
 8   and that he may have, Mr. Marko, may have also entered into a
 9   remodeling contract with Kennedy.
10          THE COURT:  Excuse me.  Your testimony was that he
11   said what about having heard or not having heard of Kennedy?
12          THE WITNESS:  He initially said he had not heard of
13   Kennedy.
14   BY MR. HAMILTON:
15   Q.    Did you show him --
16   A.    We showed him invoices from Kennedy mailed to him regarding
17   the 7 Birnham Lane property.
18   Q.    And after showing him these documents, what did Mr. Rudi
19   say then about Kennedy Building Company?
20   A.    He was familiar with Kennedy, and that he was working with
21   Mr. Laats on a remodeling project and that he may have signed a
22   contract with Kennedy Building to remodel 7 Birnham Lane.
23          MR. HAMILTON:  Thank you, Mr. Wedding.  Your Honor, I
24   tender the witness.
25          THE COURT:  Okay.
```

1           MR. GRACE:  Thank you, Your Honor.

2                     **CROSS-EXAMINATION**

3    BY MR. GRACE:

4    Q.   Mr. Wedding, is it true that your testimony here today has

5    been a compilation of information gathered by yourself and other

6    people as a team?

7    A.   Yes.

8    Q.   You were involved in the team doing a forensic

9    investigation, is that correct?

10   A.   That is correct.

11   Q.   You were privy to a number of documents or were you privy

12   to a number of documents that were found, used and analyzed in

13   this forensic examination?

14           THE COURT:  Excuse me just a moment.  Maybe we do need

15   to talk for just a second.  Let me ask you, Mr. Wedding, if you

16   would step out in the hall for just a moment.

17           (The witness left the courtroom.)

18           THE COURT:  Maybe I'm not hearing correctly, but I did

19   not hear him testify as to a compilation of anything.  What I

20   heard him testify to were comments that were made during an

21   interview session, not relating to documents, except showing

22   documents to Mr. Rudi.  So --

23           MR. GRACE:  I'll try to -- that was my concern.  That

24   was my objection, that he was testifying to a lot of things that

25   he didn't have any firsthand knowledge of.

1   THE COURT:  But all he testified to was what Mr. Rudi
2   said and certain documents being presented to Mr. Rudi and
3   Mr. Rudi's response.  He hasn't testified to the truth of
4   anything.  It's almost like maybe the Government initially was
5   anticipating putting on something and you initially were
6   anticipating hearing certain testimony but that didn't come
7   about, only statements made by Mr. Rudi.
8   MR. GRACE:  All I'm trying to do is lay a foundation
9   that he has information based on the same information he gave on
10  the record, it came from sitting in on interviews, reviewing
11  documents.
12  THE COURT:  He hasn't talked about reviewing
13  documents.  He just talked about what happened during the
14  interview.
15  MR. GRACE:  He talked about, Your Honor, I think
16  presenting Mr. Rudi with various documents and saying, do you
17  know about this and that's a compilation of stuff done by other
18  people.
19  THE COURT:  What's the relevance of that?  Isn't the
20  relevance that the import of the comments made by Mr. Rudi,
21  regardless of what he was shown?
22  MR. GRACE:  I would contend, and I'll talk about that
23  later, but what I intend to ask him --
24  THE COURT:  Well, you may ask him anything, but, you
25  know, you may also open a door that has not been gone through

1    yet, and so --

2         MR. GRACE:  Let me get back to my original objection.

3    The Government contends and stated in the presentence report,

4    that what we're talking about here is the Defendant, who

5    contends that the gain is 250,000.  The Government is contending

6    that the gain is 600,000.  I thought the whole impetuous of this

7    hearing then was to determine whether that different amount

8    should be a gain to Mr. Rudi, so naturally we have to determine

9    where it comes from, for it to be a gain.

10        THE COURT:  It's fine with me if you ask him these

11   questions.

12        MR. GRACE:  None of this has been where this money

13   came from and connecting it to something that's illegal.  The

14   lawyer in you says you got to argue something.  It becomes awful

15   simplistic for me to say they didn't touch it, Judge, didn't lay

16   a glove on it, but right now we haven't heard anything about

17   where the gain comes from, trying to say Mr. Rudi denied this,

18   denied that, trying to muddy the water about stuff that's

19   totally relevant.  The documents indicate who bought the home.

20        THE COURT:  I'm going to let you do it.  You don't

21   need to make your argument now.  Bring him back in.

22        MR. GRACE:  If you understand where I'm going, I don't

23   need to ask.

24        THE COURT:  You ask.

25        MR. GRACE:  I was very serious about that objection,

1  in that I wanted the Government to focus on where the gain is.

2          THE COURT:  I overrule your objection.  You ask

3  anything you would like.  Bring him back in.

4          MR. GRACE:  Judge, without having to take the stand, I

5  will tell the Court, I have no questions based on our --

6          THE COURT:  You ask him anything you like.

7          MR. GRACE:  No, sir.  I didn't want to ask him any

8  questions to begin with.

9          THE COURT:  Don't argue in front of the witness.

10          MR. GRACE:  I have no questions, Your Honor.

11          MR. HAMILTON:  Nothing further, Your Honor.

12          THE COURT:  Thank you, Mr. Wedding.

13          MR. HAMILTON:  May he be excused from his subpoena?

14          THE COURT:  Is there objection?

15          MR. GRACE:  There is no objection, Your Honor.

16          MR. HAMILTON:  Thank you, sir.

17          Your Honor, the Government has no additional live

18  witnesses.  We have some documents we would like to put in as

19  part of our case.

20          THE COURT:  Okay.

21          MR. HAMILTON:  Would that be appropriate to do at this

22  time?

23          THE COURT:  Why don't you go ahead and complete

24  whatever evidence you have and then we'll take our midmorning

25  recess and come back and hear whatever evidence Mr. Grace and

1    Mr. Clifton would like to present.

2            MR. HAMILTON:  Yes, sir.  Your Honor, copies of the

3    next document I would like to have marked is a document attached

4    to my position paper.  Your Honor, it is an invoice for $977,000

5    approved by Marko Rudi.

6            THE COURT:  That is Government's Exhibit 14?

7            THE CLERK:  Yes, sir.

8            THE COURT:  Was what?

9            MR. HAMILTON:  Your Honor, it is an invoice to BSH,

10   which of course we're arguing is the company that sent the wire

11   for the house, and it's $977,000.  There is a notation in the

12   lower right-hand corner on 3/24/2004 approved for payment, Marko

13   Rudi.  We would offer that.

14           THE COURT:  Is there an objection?

15           MR. GRACE:  There is not, Your Honor.

16           THE COURT:  Fourteen is admitted.

17           MR. HAMILTON:  Government's 15 is a document obtained

18   from the Cabeza (ph) law firm which handled the filings with the

19   State of Florida for South Bay Partners, Your Honor, and it is a

20   document which is a personal check from the account of Marko

21   Rudi and Debra Rudi with a notation LLC renewals and deposit

22   slip which indicates it is in fact for South Bay Partners.  We

23   would offer that as number 15.

24           THE COURT:  It is personal check to whom?

25           MR. HAMILTON:  Cabeza and Associates, a law firm in

1    Florida, who basically incorporated South Bay Partners in

2    Florida.  We would offer Exhibit 15, Your Honor.

3            MR. GRACE:  No objection Your Honor.

4            THE COURT:  Fifteen is admitted.

5            MR. HAMILTON:  Your Honor, 16 is the certificate of

6    authority of South Bay's authorities in the State of North

7    Carolina, which was filed February 2006.  That would be

8    Government Exhibit 16.

9            THE COURT:  Is there an objection to 16?

10            MR. GRACE:  There is not, Your Honor.

11            THE COURT:  Give me a moment.

12            MR. HAMILTON:  Articles of incorporation of South Bay

13    Partners in Florida as well as two annual reports or amended

14    annual reports, and I offer that as in.  Your Honor, I would

15    offer the articles of incorporation to be 17, and then the

16    annual reports to be marked as 17A and B, if that's permissible

17    with the Court.

18            Your Honor, may I offer the next exhibit.

19            THE COURT:  If you would, let me look at these.

20            MR. HAMILTON:  I'm sorry, Your Honor.

21            THE COURT:  Okay.  Seventeen.  Let me look at 18.

22            MR. HAMILTON:  Eighteen is the drivers license of

23    Marko Rudi listing the Birnham residence.

24            THE COURT:  Is there an objection to 17 or 18 or 17A

25    and 17B?

1          MR. CLIFTON:  No, sir.

2          THE COURT:  Each of those are admitted.

3          MR. HAMILTON:  Your Honor, may I move the next

4    exhibit?

5          THE COURT:  Okay.

6          MR. HAMILTON:  Government's Exhibit 19 is an email

7    from Mr. Laats to Mr. Rudi, dated 9-23-03.  Your Honor, it is in

8    Estonian, but it has been translated into English, and I would

9    like to offer as 19A the certificate from the certified linguist

10   who translated it and the accreditation of this person to show

11   the authenticity of this person, and offer these as 19 and 19A.

12         THE COURT:  Is there an objection to 19 or 19A?

13         MR. GRACE:  No, there is not, Your Honor.

14         THE COURT:  Let me see if I understand you.  19A is

15   the document I am holding in my right-hand?

16         MR. HAMILTON:  No, sir.  19 would be the Estonian

17   document and the translation.  19B would be the translation

18   certificate.  I could see that would be problematic for the

19   record.  Could I re-number those?

20         THE COURT:  Let's go ahead and take our midmorning

21   recess now so you can do that.  Do you have other documents?

22         MR. HAMILTON:  I have one other document to add, and

23   Mr. Clifton has pointed out to me that some surplusage needs to

24   be redacted.  He will stipulate to that, so I can do that during

25   the break as well.

```
1            THE COURT:  Let's take our midmorning recess.

2            (Recess taken from 11:35 a.m. to 11:55 a.m.)

3            THE COURT:  Mr. Hamilton.

4            MR. HAMILTON:  Thank you, Your Honor.

5            MR. GRACE:  I would note for the record, that Mr. Rudi

6    hasn't been returned to the courtroom.

7            THE COURT:  Thank you.  Let's wait.

8            (Defendant is present.)

9            THE COURT:  Mr. Hamilton.

10           MR. HAMILTON:  Your Honor, if the Court pleases, we

11   have two more documents to hand up to the Court before we rest.

12   Document Exhibit Number 20.  It is an Estonian version of an

13   email between Mr. Laats and Mr. Marko, 9-26-2003, at 4:56 a.m.

14   Government's Exhibit --

15           THE COURT:  9/26/2003.

16           Go ahead.  I still have the same questions I have

17   about 19 and 19 B.

18           MR. HAMILTON:  All right, sir.  Could I try to explain

19   19 for Your Honor?

20           THE COURT:  Yes.  Tell me, 19A is what?

21           MR. HAMILTON:  19A would be the English translation,

22   Your Honor, of 19, which is the actual Estonian email.

23           THE COURT:  I thought that was what I asked you

24   earlier and we were understood that was not what it was.  19B is

25   the certification, 19A is the translation?
```

1          MR. HAMILTON:  Yes, sir.

2          THE COURT:  Of the actual email which is on the back

3    side of that in that envelope?

4          MR. HAMILTON:  Yes, sir.  That translation would cover

5    all of the other emails as well to show providence or origin of

6    them.

7          THE COURT:  19B?

8          MR. HAMILTON:  Yes, sir.

9          THE COURT:  And 20 then?

10         MR. HAMILTON:  Another email, Your Honor.  Different

11   email.  Twenty would be the Estonian version of an email to

12   Mr. Laats from and Mr. Marko on 9/26/2003, 4:56 a.m.  20A would

13   be the English translation.

14         THE COURT:  Is there an objection to 20?

15         MR. GRACE:  There is not, Your Honor.

16         MR. HAMILTON:  Government's Exhibit 21 is a

17   certification of business records by the UPS store, and the

18   document they are certifying is 21A, which is showing Mr. Laats

19   renting a box at the UPS store located on Meadowmont Village

20   Road in Chapel Hill.

21         THE COURT:  Do you object to 21?

22         MR. GRACE:  No, sir, Your Honor.

23         THE COURT:  Let me look at these, please.

24         Okay.  Will there be evidence on behalf of Mr. Rudi?

25         MR. GRACE:  There will not be any formal evidence,

1    Your Honor.  I would like to be heard.

2            THE COURT:  You certainly may be.  This would be as

3    appropriate as any time at all.

4            MR. GRACE:  Your Honor, last week a group of lawyers

5    and Mr. Clifton and I met after work.  We had a couple of drinks

6    and we started, as we normally do, and we ended up telling

7    Osteen stories and Tilley stories and Bullock stories and we

8    tell the stories about when we were in court before various

9    judges and things that happened and I related to them a case

10   about six years ago where Mr. Weinman was the prosecutor, where

11   Greg Davis and I had codefendants and we had a sentencing

12   hearing before you for about three days and at the end of the

13   third day, everybody sort of reached the end of their ropes and

14   we all were a little testy and I was trying to make a point that

15   the Government had thrown a lot of stuff up against the wall to

16   see what would stick, and to emphasize, I threw my pen across

17   the courtroom and hit the wall.  You never mentioned it.

18   Afterwards you called me up and said, you may want to pick up

19   the pen.  Mr. Clifton said I wouldn't advise you to do that.

20   No.  That was just one of those things that happened that you

21   don't think about and I'm not going to take an attack on

22   Mr. Hamilton, but I am going to attack his evidence and the lack

23   of it.

24           I want to focus the Court on what I think the issue is

25   here today and I think the Government's introduced a lot of

evidence, a lot of documents and some witnesses, none of which
have anything to do with what the issue is, and that's because
the Government lacks any evidence on the key issue.  The key
issue in this case is, whether or not any monies other than the
$254,976 that came into the account for the purchase of their
home, that's obvious from all the evidence, and it's contained
in the presentence report, a presentence report that the
Government has adopted, except for -- or the Government has
adopted the presentence report the report in full.  We have
taken exception to that amount of gain, but the presentence
report sets out very concisely what this whole arrangement was.
Mr. Rudi worked at RTI.  RTI was given a contract, let a
contract by Mr. Rudi.  At some point shortly thereafter, the
contracting party, BSH, which was the contractor, wired $250,000
into the trust account of the law firm that did the closing.
That's uncontroverted.  We have never backed away from that and
we don't back away from it today.

          The gravamen of Mr. Rudi's mistake -- it was wrong,
and that $254,000 went into the purchase of the home.  Now, the
home was ostensibly titled in South Bay, and there is no
question about that.  I mean, the records, the deed that was
recorded at that time was not a deed that somebody went back and
redid.  That was the original deed on record for anyone to see.
That was no attempt to hide that.

          Mr. Hamilton has made a great deal about Mr. Rudi

attempting to get invoices in the name of South Bay. It just
makes sense if South Bay is going to get any tax write-off, for
being the owner of that piece of property as a LLC, that the
invoices have to be in its name, South Bay. Mr. Rudi could not
at the same time take a write-off for interest that he paid on
it. I mean, it was just a business decision to do it in South
Bay. But the question is, where did the remainder of that money
come from that purchased that home? That's the gist of this
whole sentence, and determining the gain.

As the presentence report sets out, the money came
from a company by the name of Exford. The Government has
offered you absolutely no evidence, except that the Government
has accepted this report which sets out the fact that Exford,
SA, provided those monies and other monies that went toward
renovation. There was an additional 300 some thousand dollars
that went toward the purchase price, and then additional monies
above and beyond the purchase price that went into renovations,
all of which came from Exford. There is not one single shred of
evidence in this report, or anything that Mr. Hamilton has put
on this morning, that would create a connection between Exford
and BSH, which was a subcontractor that sent the original
$250,000 to closing, or Exford and RTI. Mr. Hamilton would have
you find that if Marko Rudi gets a payment of $254,000 from BSH,
which is an improper and illegal payment, and borrowed another
$300,000 from the bank and takes that entire sum and purchases a

home with it, then the total value of that home is a gain to
Marko Rudi.  I haven't been able to find any case law or other
law that supports that position, and it sounds like a rather
simplistic argument, but I'm not going to get engaged with
Mr. Hamilton about whether or not Marko Rudi tried to hide his
involvement in the home at the outset, because you remember,
Judge, that was a 254,000-dollar payment that came in at that
purchase, that if you are involved in this scheme you are
naturally going to try and hide, I don't have anything to do
with this house, not because this company Exford, SA is putting
money into it, but because BSH has put money into it, and BSH is
a subcontractor of the company I work for and has received a
contract that I had a part in letting, so that's why I'm not
telling everybody that I'm a part of the ownership of this
house.  But, that has nothing to do with the ultimate question.

        If the Court decides that by comingling the monies
from BSH along with monies that came from other sources that
have nothing to do with BSH or RTI, then I'm dead in the water.
If that comingling allows the Government to bootstrap and then
say everything that you add to two 255,000 becomes a benefit to
you, therefore, the total amount is benefit for purposes of
these calculations, I'm pretty much out of luck.  I can't argue
you any case law, because there is no case law that supports
that position.  It is just not there, Judge, and this is what I
was attempting to focus the Court on in the beginning.  All of

the evidence was trying to show that Mr. Rudi denied involvement
in the property, and the Government is going to show you that he
does own the property or does have some -- does receive some
benefit from the property.  Well, we've never denied that and
we're not denying it today.  It is clear that he and his wife
lived in the property.  It is clear that they put some of their
own money in it, but it's more clear, and it's evident that
$254,976 is the money -- are the monies that form the basis of
the penalty.  I don't know how eloquent -- I just, it seems like
I'm not doing my client a good job if I say, Judge, it's just
that simple, but it is just that simple, and if there is some
case law, I haven't seen it yet.

      We received hundreds of thousands of documents in this
case.  This has been a long arduous task sorting these
documents, talking to people, some of the people are
extraterritorial.  A lot of things we couldn't get, but the one
thing we've always been focused on is, trying to find a
connection and making sure that the Government, if they contend
there is a connection between RTI or BSH and any other party
connected to Marko Rudi, that they give us the evidence of it.
We have received none.  None has been introduced into evidence
today.  None is claimed and intended for in the presentence
report, and to that reason, we argue that the gain to Marko Rudi
is only the wire from BSH into the account which purchased the
house or purchased the home and that is ultimately -- or that

1    Mr. Rudi was ultimately the beneficiary of, and he's admitted

2    that from day one to day last.  We admit it here today.

3           I don't know how more forceful I could be and how much

4    more I can challenge the Government to stand up and tell me that

5    anything above and beyond that is speculative.  It is

6    speculative if the Government contends that the other $500,000

7    must have, by some other circuitous route came from BSH or RTI.

8    If the Government has clear and convincing evidence of that, it

9    ought to present it.

10          THE COURT:  They don't need clear and convincing

11   evidence, all they need is evidence by a preponderance.

12          MR. GRACE:  By a preponderance.  There has to be a

13   connection before there is even a preponderance, a connection

14   between Exford, which is where the money came from, and the

15   parties who are out of money.  There is no contract between

16   Exford and RTI.  There is no contract between BSH and RTI.

17   There is no wire transfer.  There is no witness who will testify

18   that there was a cash transaction, some courier that says I took

19   some money over from BSH to Exford and the Government could say,

20   Judge, we contend that's the money that was later given to Marko

21   Rudi.  There is nothing.  It becomes speculation as opposed to a

22   cause causal connection or nexus.  It is purely speculation and

23   that's what the Government is going to argue to you.  I don't

24   think the Government is going to argue that the mixing of 254

25   with the other money makes it all a benefit.  I think they are

going to argue that somehow or another, Judge, though we can't

prove it and we can't show you a single document, we can't bring

a single witness forward, but we think and, therefore, we argue,

and we ask you to find that all of this money came from RTI, BSH

or some relationship with the two through another route to Marko

Rudi, but the evidence and the testimony, the documents just

aren't available.

Judge, I have arguments depending on the Court's

finding at this point, where we should be under 3553, if you

would like to hear those arguments now or after you make your

decision and your ruling on the question of the gain.

THE COURT:  Why don't we focus on the gain first and

then come back.

MR. GRACE:  That would be my argument on the gain,

Your Honor.

THE COURT:  Thank you, Mr. Hamilton.

MR. HAMILTON:  We would request that the Court focus

on the efforts to disguise the purchase of the house and the

funds going into the house, and also focus on his, Mr. Rudi's

denials when he was interviewed at RTI.

As the Court knows, Your Honor, this house was

purchased by a company called South Bay.  This company was

formed in early March 2004, in Florida.  The closing occurred on

March 29, 2004 in Durham.  The funds used to buy the house are a

$50,000 wire from a company called Exford sent through a bank

called Lateko.  Lateko Bank will become more relevant.  $254,000
was wired on the day of the closing from BSH, who was
subcontractor who had business with RTI.

Now, timing is very important here.  One of the
documents that we submitted is an invoice for $970,000.

THE COURT:  Which documents is this?

MR. HAMILTON:  Your Honor, I'm not sure of the number.

MR. GRACE:  Let meet help you Mr. Hamilton.

MR. HAMILTON:  Single page exhibit.  It is an invoice,
I believe it is 16, but I'm not sure.

14.  Excuse me.  Thank you.

MR. HAMILTON:  Okay.  Your Honor, that is an invoice
from BSH, the same people who sent the $254,000 wire on
March 29.  That's an invoice, I believe, on March 24th in which
the lower right-hand corner, Marko Rudi approved payment, right
during the same time period when this house is being purchased
in Durham.

Your Honor, this house, if it was not some reason to
hide or conceal things, could have been put in Rudi's name.  It
could have been put in South Bay's name with Rudi being listed
on some of the documents, referring to documents that the State
of North Carolina and State of Florida, but as you can see from
the documents we've submitted, Mr. Rudi's name does not appear
on any of the corporate documents or articles of incorporation
in Florida or North Carolina.  Eventually, Mr. Laats is

1  eventually named as manager for South Bay.

2          THE COURT:  What is Exford?  Talk to me about that.

3  That's your crucial link here.

4          MR. HAMILTON:  I understand, Your Honor.  We don't

5  really know a lot about it.  All we know is, it's an offshore

6  company that has sent money to this closing.

7          THE COURT:  How do we have the inference that that

8  money came from BSH or people who we --

9          MR. HAMILTON:  The timing of it.  The timing, which is

10  the same time of these invoices, timing so close to the BSH

11  invoice.

12          THE COURT:  Perhaps it came from some other

13  contractor.

14          MR. HAMILTON:  Your Honor, I think certainly we

15  realize that it is circumstantial.

16          THE COURT:  I mean, my point is, even if it was ill

17  begotten, how do we know it didn't come from some other

18  contract, not the BSH contract, but some other contract?  How

19  are we able to make that leap?

20          MR. HAMILTON:  I don't know that we can make that

21  leap.

22          THE COURT:  Without being able to make that leap, then

23  how can we tie it to BSH.

24          MR. HAMILTON:  The fact that Mr. Rudi denies --

25          THE COURT:  He would deny it if it were ill begotten

```
 1    from some other company, would he not?  He would deny if even if

 2    it was BSH involvement, would he not?  Even if Exford was for

 3    some reason legitimate?

 4              MR. HAMILTON:  Mr. Rudi was working for RTI and has

 5    Government contracts.  We're hoping to make an inference that it

 6    would be Government money.  Without access to international bank

 7    records, that's what we have to do, Judge.

 8              THE COURT:  I believe you are just not able to make

 9    that.

10              MR. HAMILTON:  I understand the point, Your Honor.

11    I'll be brief.

12              THE COURT:  You certainly have a compelling argument

13    on the effort to conceal, the lack of candor, actual

14    misrepresentation with regard to his involvement, who he knew,

15    but I don't believe you're able to make it on who Exford was and

16    tie it to BSH.

17              MR. HAMILTON:  Your Honor, I think you appreciate all

18    of our argument on that, so I'm not going to be tedious to

19    restate it.  I think, for instance, paying the fees for South

20    Bay Florida shows that he really is South Bay.  Him signing that

21    realtor agreement is shown he is acting for South Bay, but

22    didn't want be to known acting for South Bay.  We can prove that

23    and admit to the Court that any amount above the BSH wire we're

24    relying on circumstantial evidence, Your Honor.

25              THE COURT:  Okay.
```

1          MR. HAMILTON:  Thank you.

2          MR. GRACE:  Judge, even in light of what -- may I make

3   one point in trying to dissuade two points from settling in the

4   Court's mind?

5          THE COURT:  Sure.

6          MR. GRACE:  Remember, please, that his deception, his

7   evasion had a -- there is a lot of reason, other than some other

8   monies.  There is $254,000 that's coming to BSH directly from --

9   I mean, coming into this holding company.

10         THE COURT:  What are you arguing about here?

11         MR. GRACE:  What I'm trying to say is, that there is

12  no deception, other than there is 254,000 he's trying to keep

13  everybody from finding.

14         THE COURT:  Mr. Grace, I'm not making a finding that

15  it was limited to $250,000, it was obvious deception.

16         MR. GRACE:  Yes, sir.

17         THE COURT:  Listen to me.  I am finding it is limited

18  to the $250,000, so I don't think you have anything to argue

19  about.  It is fraud, his fraud is his fraud, whether it is

20  250,000 or 850,000.

21         MR. GRACE:  That's the point I wanted to make.

22         THE COURT:  And there is plenty of fraud there.  He

23  misrepresented, he defrauded, he made deceitful statements in

24  order to hide the truth of what was going on, but I held in your

25  favor.

1          MR. GRACE:  I'm not trying to get you to hold

2  otherwise, but I wanted to say, that's what we've been trying to

3  say all along.  Never said he was not deceptive.  He was not

4  trying to hide it.  He has 254,000 reasons to lie and he did and

5  that's wrong and that's the point I want to make, because we're

6  going to go into another phase of this discussion and I'm just

7  trying to get -- hopefully get the Court to focus that there is

8  a reason to lie about $254,000.  He did that, clearly, and he

9  basically tried to hide that and we accept it.

10         THE COURT:  Okay.  Where does this bring us,

11  Mr. Maciejewski?

12         THE PROBATION OFFICER:  The loss now is over 400,000,

13  which added 14 levels.  We would drop down to the next level

14  which is over 200,000.  So it's a difference of two levels.

15  Total offense level was 19.  It would go to 17, and one, Your

16  Honor.

17         THE COURT:  And that would do what to the imprisonment

18  range?

19         THE PROBATION OFFICER:  It would be 24 to 30 months.

20         THE COURT:  And supervised release range would remain

21  the same and fine range would become what?

22         THE PROBATION OFFICER:  The fine range would become

23  5,000 to 1 million.

24         THE COURT:  Zero amount of restitution?

25         THE PROBATION OFFICER:  Yes, sir, Your Honor.

1          THE COURT:  And $100 special assessment?

2          THE PROBATION OFFICER:  Yes, sir.

3          THE COURT:  Does anybody disagree with that, based on

4  the findings?

5          MR. HAMILTON:  No, sir.

6          MR. GRACE:  No, sir.

7          THE COURT:  Now I'll be glad to hear from you.

8          MR. CLIFTON:  If I may take this part of the argument,

9  Your Honor.

10          THE COURT:  Surely.

11          MR. CLIFTON:  I have gotten about as emotionally

12  involved in a case with this case as I ever have with anything.

13  This case, I initially got into it along with David Long, almost

14  two years ago.  The warrants were drawn and sent to Estonia,

15  where Mr. Rudi had returned to live and work.  He was working at

16  that time for Ernest and Young in eastern Europe.  Hadn't met

17  Mr. Rudi.  I think probably had some grand visions of going over

18  there and meeting him and that didn't happen.  He wound up being

19  in jail in Estonia for just about ten days short of a year

20  during the extradition process.  I have attached to our position

21  papers some documents from Estonia that I actually got off the

22  internet about the conditions in the jails there and others from

23  two of his lawyers who are in Estonia.  Jails there are bad and

24  I have come before this Court on more than one occasion --

25          THE COURT:  Could he not have waived and gotten out of

1   the jail and come here voluntarily?

2          MR. CLIFTON: Yes, sir, he could have.

3          THE COURT: But you expect me to give him credit for

4   fighting extradition, but yet give him credit for remaining in

5   jail?

6          MR. CLIFTON: Actually, you can consider when you are

7   looking at a period of confinement, where that time is spent.

8   Pursuant to Bureau of Prisons policies and case law here, he

9   gets credit for that time, and my point would be, Your Honor,

10   whether it was one year, 20 years, three years he didn't get to

11   do it in what would probably be a lower facility place in the

12   United States. He was in a jail in Estonia and conditions there

13   were barren and very brief. I have often argued to this Court,

14   you know, Judge, my client, because the Government backed up or

15   couldn't work it out they had to sit in Alamance County Jail for

16   a year and a half, I think it's fair to say where he sat. He

17   did fight extradition, and he could have done time in jail here,

18   but he made that decision, but he suffered consequences

19   nonetheless.

20          THE COURT: I'm not likely to give him the benefits of

21   that. There is a difference, I understand in perspective when

22   you are representing someone, and I well remember those

23   differences, and you do get wrapped up and you believe in the

24   people that you represent. I'm certainly not being critical

25   from your doing that, but from a perspective of which I see it,

1    I'm not terribly sympathetic for him making the choice to fight

2    extradition and remain there regardless of what those conditions

3    were, since that was pretty much his choice, because he has

4    admitted guilt here, and the evidence certainly shows there is

5    guilt, so he was denying extradition, resisting extradition

6    because he didn't want to come to grips with what he had done.

7              MR. CLIFTON:  Once he did come here, he spent the next

8    ten months, he was in Forsyth County Jail.  I've seen him in

9    Farmville.  I've seen him in Graham.  He had been in jail and we

10   asked for a long continuance.  We needed it based on all the

11   documents, but even if he didn't get credit for that year he was

12   there, that concession, he's been in jail as opposed to a

13   federal facility.

14             The other issue which I think is very important for

15   the Court -- I realize Mr. Howard is here, God bless him, he had

16   a baby on Monday.  We appreciate him coming down here for this

17   today.  Mr. Rudi has been involved and helpful through counsel

18   with the victim corporation in this case, RTI.  We have provided

19   hundreds of documents, notebooks, and Mr. Howard, in a letter to

20   probation, noted the assistance that he had given them in

21   helping them iron some of this stuff out.  He didn't assist the

22   Government, so we can't sit here and say he should get credit

23   under 5K or 3553, however, he did do some good once we were in

24   that position.  I went and met with Mr. Buckholtz and Mr. Howard

25   more than once, even before the plea in this case, saying here

1   is what we did wrong, here is how it happened, here is what went

2   on and it has helped them in some of their dealings since then

3   to deal with that situation.

4           I would briefly note for Your Honor, he has absolutely

5   no criminal record of any kind.  He has a very good education.

6   He's clearly a very bright man.  Whatever sentence he gets, when

7   he's done, he will be going back to Estonia.  He will not get

8   any credit for halfway house.  He won't get the possibility of

9   doing some other confinement.  He does it all in jail or prison,

10  wherever he goes when leaves here today.

11          Based on that and the recommendation from the

12  Government that the Court sentence at the low end, especially

13  based on his cooperation with RTI, I would ask that Your Honor

14  that request from the Government and find this the range of 24

15  to 30 months, and consider sentencing him to 24 months.

16          THE COURT:  Thank you, Mr. Clifton.

17          MR. CLIFTON:  Thank you, Your Honor.

18          THE COURT:  Mr. Hamilton, you are recommending the 24

19  months?

20          MR. HAMILTON:  Your Honor, in the plea agreement the

21  Government recommended to the Court a sentence at the lowest end

22  of guidelines.

23          THE COURT:  I think that's all you can say.

24          MR. HAMILTON:  Yes, sir.

25          THE COURT:  Thank you.  And I cannot sentence him to

1 24 months, simply can't do it. This is awful fraud. This is a

2 bright man who came here and took advantage of money from this

3 country. Took advantage of the company he was working for.

4 Knew that money was entrusted. He went through great lengths to

5 hide his involvement in this, and then he lied about his

6 involvement in this, until presented with the evidence that

7 people had determined what the facts were, so I'm not going to

8 find that he should be sentenced to the low end of that advisory

9 guideline.

10 As to where over that he is to be sentenced, I'll be

11 glad to here from Mr. Rudi. Maybe he can even talk me into

12 going to the low end, but there is a lot of talking that needs

13 to be done before I would even consider that, Mr. Rudi. You may

14 certainly have a go at to.

15 THE DEFENDANT: Your Honor, I think may lawyers have

16 already said everything on my behalf. I appreciate it.

17 THE COURT: And they have done a wonderful job on your

18 behalf.

19 You know, my problem right now, if I were going to

20 sentence at this moment, I would vary upward because of the

21 magnitude of the fraud Mr. Rudi has perpetrated and attempted to

22 perpetrate. A sufficient sentence, I think, at this very

23 moment, probably does not lie within that recast guideline

24 range. I'm going to let you all come back about 3:00 o'clock,

25 and I'm going to think about it between now and then and mull

1   over what you have to say, but I'm not going to hear new

2   arguments then.  If anybody has anything else you want to say,

3   this would be the time to say it.

4            MR. GRACE:  Would you give us a moment, Your Honor?

5            THE COURT:  Of course I will.

6            MR. GRACE:  Do you contemplate hearing something new

7   and different now, or at 3:00 o'clock when --

8            THE COURT:  I don't want to hear any new arguments,

9   I'm just going to announce my sentence when we come back.  I

10  don't want to hear any new arguments then.  If there is anything

11  you want to say, this would be the appropriate time to do it.

12           MR. GRACE:  Just briefly, Judge.  We can't change the

13  nature of the fraud.  It is what it is, but I think if we talk

14  about the advisory guidelines, nothing within what he did falls

15  outside of the advisory guidelines by way of amounts, conduct or

16  anything else.  I would urge the Court to take into

17  consideration that if some of the other parties were not

18  extraterritorial, he would probably be rendering substantial

19  assistance.  There was none to render.

20           THE COURT:  I can't consider that, Mr. Grace.  That's

21  not a leap I can --

22           MR. GRACE:  The leap I want you to make is instead of

23  that, we went to RTI and helped clear up some things, sat down

24  and became extremely candid.  I don't know whether anything

25  within this particular fraud is more fraudulent than other

```
 1    white-collar crimes, and I don't mean white-collar is better

 2    than anything else, I just don't know that there is anything

 3    extraordinary about it.

 4            THE COURT:  That's for a departure.  There is

 5    difference between a departure and a variance.  A variance looks

 6    at 3553(a) factors.  Departure looks at guideline factors.

 7            MR. GRACE:  That's exactly right.

 8            THE COURT:  I'm not limited.

 9            MR. GRACE:  You clearly are not limited.  I'm just

10    asking you that why -- I'm not saying you don't have the power

11    to do it, I'm asking you to look at the facts and make a

12    determination that there is nothing within the facts that you've

13    heard, especially when you hear about a man who from day one has

14    admitted his responsibility and helped out.

15            THE COURT:  He hasn't done it from day one.  Obviously

16    the letters from South Bay asking for invoices from Mr. Kennedy

17    and Hallyburton were an attempt to cover up what took place, and

18    then --

19            MR. GRACE:  But at that point, no one was asking him

20    about it.  This was prior to investigators coming out.

21            THE COURT:  He was being asked about it at the time

22    that Mr. Wedding talked about when he was denying any

23    involvement.  He has not from day one been open about it.

24            MR. GRACE:  I think Mr. Wedding testified that within

25    those conversations he was the man that said, yeah, I do know
```

1    Laats, I know --

2         THE COURT:  Only when he had to.  He only admitted it

3    when he knew they knew.

4         MR. GRACE:  I'm just saying to you, Your Honor, that

5    if there is something above the low end which I think Government

6    not only has to stand up and say please do, I think they have to

7    advocate it under the law, and I don't know what advocate means,

8    but case law in the Fourth Circuit says the Government has to

9    advocate for the low end, but I think within --

10        THE COURT:  I understand Mr. Hamilton is asking me to

11   give a sentence at the low end of the guidelines, the guideline

12   range.

13        MR. GRACE:  If the low end didn't do it, Judge, I

14   think within that guideline there is that -- sometimes that

15   satisfies requirements under 3553 within that advisory range.

16   It may be higher than what we're asking, and if that's the

17   Court's decision, you know, we'll live with that.  We know it

18   will be a decision -- if you're willing to take to time to mull

19   over, then you're at least concerned about it, and that's all we

20   can ask.

21        So within the advisory guideline, you're not going

22   to -- we accept what we get.  I don't always agree with you and

23   neither does any lawyer here, but I can accept that you find

24   within the guideline that the low range is not appropriate.

25        THE COURT:  If I sentence right now, I'm certainly

1    not.

2         MR. GRACE:  I understand that, and I understand the

3    pause to reflect.  If I had enough nerve, I would ask you to do

4    that, but you did it on your own motion, and that's all we can

5    ask.

6         THE COURT:  I think Mr. Clifton has --

7         MR. CLIFTON:  If I may, Your Honor.  If the court

8    would hear just -- and I don't think he has to be sworn, for

9    Mr. Howard, he is an officer of the court, he is a lawyer, and

10   he has done this job -- he was my contact.  He is who we worked

11   with at RTI.  I think he might be able to give Your Honor some

12   idea of the assistance that they feel like they got from

13   Mr. Rudi, because generally assistance the defendant gives is

14   important.

15        THE COURT:  Well, he would have to take an oath and be

16   sworn and testify, and if that's what you want to do, then we'll

17   come back at 2:00 o'clock and you may present that -- 2:15,

18   we'll come back at 2:15.

19        MR. CLIFTON:  I'm not sure if I want to do that.  If I

20   could have that long to make that decision.

21        THE COURT:  You are going to be put me in a position

22   then of not being able --

23        MR. GRACE:  I rather you come back at three.

24        MR. CLIFTON:  I don't want to put Mr. Howard in that

25   position.

1          THE COURT:  I can't just hear from him simply because

2     he's an officer of the court.  I can't take what you say or

3     Mr. Hamilton says as factual predicate for anything.  You have

4     to present evidence.

5          MR. CLIFTON:  Sure.  I was thinking in his role as an

6     attorney for the victim.  I understand that.

7          THE COURT:  I have much respect for Mr. Howard.  I've

8     known him for many years, before he was a lawyer.  Probably

9     would embarrass him if I said the age he was when I first met

10    him.  It's not that.  I don't take it from anybody from the body

11    of the courtroom.

12         MR. CLIFTON:  I understand.

13         THE COURT:  2:15 or 3:00 o'clock?

14         MR. CLIFTON:  3:00 o'clock.

15         THE COURT:  We'll adjourn until 3:00 o'clock.

16         (Recess taken from 12:35 p.m. to 3:00 p.m.)

17         THE COURT:  Folks, I have ruminated on this, and am

18    unable to conclude that a variance would not be appropriate in

19    this case.  Mr. Rudi came to this country.  He availed himself

20    of educational programs.  He availed himself of employment.  A

21    good job, of a position of trust.  He was dealing with money

22    coming directly from the United States taxpayers.  We do not

23    know for what period of time he was doing this.  We do know that

24    he asked others according to the presentence report for

25    kickbacks.  We know he steered work to a company in which

1   relatives or people with whom he was closely associated were

2   involved.  We know that he accepted over $250,000 from that

3   company, that he went to great lengths to set up what apparently

4   from all of the evidence is simply a shell corporation in which

5   he controlled the setting up and the filing of documents,

6   reports.  He gave misinformation about people involved when

7   questioned, about acquaintances and his relationship with them.

8           I have recognized that he has not been found guilty of

9   other criminal involvement, but it does seem to me, that taking

10  over a quarter of a million dollars from the taxpayers the way

11  he did, the steps he took to conceal it, even giving him credit

12  for what he has done now in giving RTI information to help

13  resolve this, considering the deterrent question, I understand

14  it's not a question of deterring Mr. Rudi further, that he's

15  going to be deported or will choose to live for Estonia or

16  elsewhere, but certainly others who are similarly involved in

17  programs where substantial amounts of taxpayer money is involved

18  and the effort to help others outside this country, there must

19  be temptation to do what he did and those people must be

20  deterred and if they see a short or abbreviated sentence on

21  somebody who has taken over a quarter of a million dollars, in

22  these circumstances, to me that didn't seem to be much of a

23  deterrence.  The public is not protected.

24          So, after considering those factors, it is my

25  determination, that the shortest sentence I can find that I feel

1  is sufficient to address this is 33 months, to be followed by a

2  period of supervised release of three years, with the only

3  special condition of supervised release in addition to the

4  standard conditions, being not to return to the United States,

5  unless you first get permission to do so, Mr. Rudi, then it

6  would be fine, but you may not return without getting permission

7  during these three years.  If you should be deported, and I

8  don't know that you will be, since I don't know the law with

9  regard to deportation in the situation which you are in, so

10  there may be no deportation, but when somebody is deported, then

11  there is a statute of the United States which criminalizes a

12  return at any time, or even after that period of supervised

13  release would be over, for someone to come back without

14  permission.  So that's something you should look into if you

15  should be deported.

16        It is my determination that a fine of a $150,000 is

17  properly entered in this case.  I will hear you all with regard

18  to how payments can be made with regard to that.

19        Did you all want to sit down and talk with Mr. Rudi?

20        MR. GRACE:  If we may.

21        THE COURT:  I'm not trying to set him up for some kind

22  of failure.  There may be no way the Government could ever

23  realize any of it, and with that in mind, Mr. Hamilton, does the

24  Government still seek a fine in this case?  I know if you do, it

25  would have to be the low end of the advisory range.

1           MR. HAMILTON:  Yes, sir, we would.

2           MR. GRACE:  Your Honor, I can tell you some of which

3    is obvious, he is unemployed, will be unemployed for the next

4    several months, and then possibly deported.  The asset that he

5    had, the house, was sold.  DSH was receiving money back from it.

6    The rest went back to Exford, which at this point I will tell

7    you is his dad's company.  Mr. Rudi doesn't have any assets or

8    any ability at this point to pay anything.

9           THE COURT:  Well, he is well educated.  He has a

10   masters degree in accounting.  He has experience in accounting,

11   and is obviously an extremely bright person.

12          MR. GRACE:  He is that, and a convicted felon.  Of

13   course it is going to be tough.  I don't know if anybody in

14   Estonia cares that he has a U.S. conviction, and you addressed

15   rightfully the question of coming back into the country.  Your

16   Honor, if he's deported, whether he'll get permission to come

17   back, but it's going to be manual labor and not what he's

18   accustomed to in terms of salary.

19          THE COURT:  It certainly may be something the United

20   States will not be able to collect on.  I don't know if there is

21   any property to levy on here.  I don't know the mechanism by

22   which the Government seeks to realize a judgment from somebody

23   in a foreign country, and there may or may not be some method of

24   pursuing that, I don't know the answer to that.  Do you,

25   Mr. Hamilton?

1          MR. HAMILTON:  I don't know.  There is a lis pendens

2    filed on the house in Durham.

3          THE COURT:  Do you know of any means for the United

4    States to collect a judgment from somebody who is living in

5    Estonia?

6          MR. HAMILTON:  I do not, I don't know.

7          THE COURT:  I'm going to order that beginning three

8    months after he is released from the prison sentence, that and I

9    will add a special condition of supervised release, and I'm not

10   sure, but I will add it as a special condition of supervised

11   release beginning then, that Mr. Rudi make payments at the rate

12   of a $150 a month for the remainder of is period of supervised

13   release toward that fine.

14         Now, Mr. Rudi, if you are unable in good faith to pay

15   that amount, then you can have that brought back to the Court's

16   attention, and I will consider reducing that monthly amount.

17   Again, I don't know the mechanics of whether there is anybody

18   who could compel you to do that or not.  I simply don't know

19   that.  There may not be.  If you do extremely well and there is

20   some means to address that through some international tribunal,

21   then the Government, upon showing that you are able to pay, can

22   bring that back to the court, so in that way, the court will

23   maintain flexibility to address the reality of whatever the

24   situation happens to be.

25         The $100 special assessment is due and payable

1    immediately.  That may be paid, however, through the financial

2    responsibility unit of wherever you do serve your time, and of

3    course you have the right to appeal from this.  An appeal would

4    have to be filed within 14 days of the time the written judgment

5    is filed, or it would be waived, so go ahead and talk with

6    Mr. Clifton and Mr. Grace about what you would like for him to

7    do, but I will say, if they had not prevailed on the amount, if

8    it had been determined by the Court the amount was over

9    $800,000, the time would have been substantially more.  I took

10   the $250,000 into consideration and this is the bear minimum

11   that I could think of that would be sufficient to address what

12   did happen in this case.

13           Anything further?

14           MR. GRACE:  Nothing further for the Defendant, Your

15   Honor know.

16           THE COURT:  Mr. Hamilton?

17           MR. HAMILTON:  We are dismissing the remaining counts.

18           THE COURT:  The remaining counts, upon motion, are

19   dismissed.  Actually, just one, isn't it?

20           MR. HAMILTON:  Yes, sir.

21           THE COURT:  Thank you.

22           MR. GRACE:  Thank you.

23           (Court adjourned at 3:10 p.m.)

24

25

1          C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY

6

7          That the foregoing is a true and correct transcript of

8    the proceedings had in the within-entitled action; that  I

9    reported the same to typewriting through the use of

10   Computer-Aided Transcription.

11         THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE

12   SIGNATURE IS NOT ORIGINALLY SIGNED BY THE COURT

13   REPORTER WHO REPORTED THIS MATTER.

14

15

16

17

18

19   Date:    7-26-10          J. Calhoun, RPR
                              United States Court Reporter
20                            324 W. Market Street
                              Greensboro, NC  27401
21

22

23

24

25